NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED BROTHERHOOD OF CARPEN-
TERS AND JOINERS OF AMERICA,
AFL–CIO, et al., Respondents.

No. 12273.

United States Court of Appeals
Seventh Circuit.

Oct. 9, 1958.

Marcel Mallet-Prevost, Assistant Gen. Counsel, Owsley Vose, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, William W. Watson, Attys., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Lester Asher, Chicago, Ill., Francis X. Ward, Indianapolis, Ind. (William A. McGowan, Indianapolis, Ind., on the brief), for respondents.

Before SCHNACKENBERG, HASTINGS and PARKINSON, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

The National Labor Relations Board (herein referred to as the Board), pursuant to § 10(e) of the National Labor Relations Act, as amended,[1] has filed in this court its petition for enforcement of its order of June 28, 1957[2] against United Brotherhood of Carpenters and Joiners of America, AFL–CIO (herein referred to as the Brotherhood), and two local unions, Nos. 377 and 633, and the Carpenters District Council of Madison County, Illinois (herein referred to as the Unions), all affiliated with the Brotherhood. The Board found that the Brotherhood and the Unions violated § 8(b) (2) and (1) (A) of the Act. In addition, the Board found that Merritt-Chapman & Scott Corporation, the employer herein involved (referred to herein as the Cor-

1. 29 U.S.C.A. § 151 et seq.

2. 118 N.L.R.B. 380.

poration), and the Brotherhood in May 1955 and thereafter were still maintaining and enforcing a closed shop as provided for in the "International Agreement" below referred to, post 2 and thereby the Corporation violated § 8(a) (3) and (1) of the Act. The Corporation has complied with the Board's order and it is not a respondent in this proceeding.

Following the filing of charges, complaints and responsive answers, a trial examiner heard the evidence of the parties, including oral testimony of witnesses, and made an Intermediate Report, which included his findings of fact and conclusions. The Board reviewed the Intermediate Report and entered the order which we are asked to enforce.

There is no dispute that, under date of March 12, 1946, the Corporation and the Brotherhood executed the following document:

"International Agreement

"Memorandum of Agreement between the firm of Merritt-Chapman & Scott Corporation, 17 Battery Place, N. Y. C. and the United Brotherhood of Carpenters and Joiners of America.

"We, the firm of Merritt-Chapman & Scott Corporation Agree to recognize the jurisdiction claims of the United Brotherhood of Carpenters and Joiners of America, to work the hours, pay the wages and abide by the rules and regulations established or agreed upon by the United Brotherhood of Carpenters and Joiners of America of the locality in which any work of our company is being done, and employ members of the United Brotherhood of Carpenters and Joiners *only*. (Italics supplied for emphasis.)

"No change to be made in the hours and wages in any locality, and no conditions imposed other than are enforced on all Local firms.

"In consideration of the foregoing, the United Brotherhood of Carpenters and Joiners of America agree that no stoppage of work or any strike of its members, either collectively or individually, shall be entered into pending any dispute being investigated and all peaceable means taken to bring about a settlement."

The General Counsel alleged that on and after May 1955 [3] the Corporation and the Brotherhood maintained and enforced the foregoing agreement.

The Brotherhood relies on the following part of § 102 of the Act of June 23, 1947: [4]

" * * * the provisions of section 8(a) (3) and section 8(b) (2) of the National Labor Relations Act as amended by this title shall not make an unfair labor practice the performance of any obligation under a collective-bargaining agreement entered into prior to the date of the enactment of this Act, or (in the case of an agreement for a period of not more than one year) entered into on or after such date of enactment, but prior to the effective date of this title, if the performance of such obligation would not have constituted an unfair labor practice under section 8(3) of the National Labor Retions Act prior to the effective date of this title unless such agreement was renewed or extended subsequent thereto."

The Brotherhood contends that the International Agreement is a collective-bargaining agreement, within the pur-

3. May 1955 was selected, because § 10 (b), 29 U.S.C.A. § 160(b), provides in part that no complaint should issue based upon any unfair labor practice occurring more than 6 months prior to the filing and service of the charge. The earliest relevant filing and service were completed on November 18, 1955, with respect to

the Brotherhood, and on November 21, 1955, with respect to the Company. The earliest date on which an unfair labor practice could be found against the Brotherhood is therefore May 18, 1955, and 3 days later as against the Company.

4. 29 U.S.C.A. § 158, historical note, 61 Stat. 152.

view of § 102. This contention the Board rejected. Without resolving that question, we note that § 102 has language meant to impose time limitations upon its operation. It has a saving clause, as to labor practices made unfair by the 1947 act, which clause refers to any collective-bargaining agreement entered into prior to the date of June 23, 1947 and, in substance, removes the effect of the savings clause upon a renewal or extension of such an agreement subsequently thereto. The agreement here involved does not provide for any definite period of time during which it shall be in effect. The saving clause does not contemplate an agreement without any expiration date. If we were to apply its language to the International Agreement in this case we would be attributing to congress an intent to keep alive indefinitely an agreement which was in direct conflict with the purpose of the act. We cannot find such an intent in the language of § 102. Stripped of the benefits of the savings clause in § 102, the International Agreement's establishment of a closed shop was barred by the 1947 act and constitutes no defense for any of the respondents in this case. However the fact that it was entered into in 1946 and was considered (although mistakenly) by respondents to be still in effect through May 1955 tends to characterize the statements and acts of several officers and agents of the respondents.

In determining whether there is substantial evidence in the record before the Board to support its findings that a closed shop was maintained in this case, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, it is significant to note that the hiring procedure followed for 20 years by the Corporation and the Unions, including the years 1954 and 1955, was, as a matter of fact, in accordance with the terms of the International Agreement, the closed shop provisions of which had been effectually terminated by the act of 1947. Also there is evidence that the closed shop provision in said agreement was

still being maintained and enforced after May 1955.

Vice-president Mynatt of the Corporation testified that this agreement has been in the Corporation file since it was signed in 1946 but that he did not believe

> "anyone has ever pulled it out to look at it until shortly before this case came up. It was one of those things that was filed and forgotten. We did in the late summer, probably it was around August or later, of '55 specifically state the agreement was not in effect."

He further testified that the Corporation policies "today" are generally the same as they were before 1946 and since 1946 and that the agreement did not affect its labor policy one way or the other.

Mynatt also testified that the Corporation abided by the rules established by the Brotherhood in the locality in which its work was being done and employed members of the Brotherhood only, but he testified that it was not because of the Agreement but rather it was the Corporation's normal method of operation.

Thomas J. O'Shea, who was general superintendent of the Corporation on the construction project in question, knew of the International Agreement, but testified that it was not the basis for his hiring of carpenters.

However, there is evidence tending to prove that the hiring practices of the Corporation were in accordance with the International Agreement and were so recognized by all concerned. O'Shea testified that in 1956 he told a Mr. Wautterson, a field examiner of the Board, that the International Agreement was still in effect. George W. Meyers, business representative of the District Council, testified that early in 1954 he had a conversation with O'Shea in connection with the project of the Corporation. O'Shea asked for a copy of "our by-laws, working rules and the present wage rate in the district". Meyers furnished him with a

booklet of the same, parts of which are as follows:

"Sec. 5

"Working with non-union men of our trade shall not be allowed and shall be considered a serious offense by this Council."

"Sec. 38

"No member shall employ or work with a non-union man (or with a member not having the current quarterly working card)."

Harold A. Hanlon, a millwright, applied to O'Shea for employment on September 2, 1954. Hanlon was accompanied by Henry H. Michel. O'Shea testified:

"I told them * * * based on what at that time I did consider to be more or less requirements of an international agreement, which I find out now my interpretation was wrong, [sic] that if they could clear with the local, which happens quite frequently on jobs, that I would be glad to hire them. If they couldn't clear, there wasn't anything I could do about it."

Hanlon testified that O'Shea said that he "had dealings with Mr. Meyers" and that he would call Meyers later and ask for Hanlon. Hanlon later telephoned O'Shea and said that Michel and he would be ready for work on Monday morning, but O'Shea said that "something had come up, that we couldn't come in on Monday morning", but he told Hanlon that he would call him later. That was the last time Hanlon and O'Shea talked to each other.

Michel was given a position as a foreman. In that supervisory position he is not involved in this proceeding.

Walter Riese replaced O'Shea as superintendent on the project, when O'Shea was transferred to another location. In the latter part of September, 1954, Meyers furnished about 20 millwrights who were employed by Riese on this project. However, Hanlon was never hired.

It is apparent that there is substantial evidence that, at the time Hanlon was attempting to be hired by O'Shea in September 1954, the Corporation was cooperating with the Brotherhood and the Unions in maintaining a closed shop.

The Board was justified in concluding from all the evidence in the record and the reasonable inferences to be drawn therefrom that a closed shop was being maintained in violation of § 8(b) (2) and (1) (A) of the Act and § 8(a) (3) and (1) thereof, as charged.

In view of that conclusion, the Board was correct in holding that there was discrimination in the failure of the Corporation to hire Hanlon. The Corporation in that respect violated § 8(a) (3) and (1) of the Act, and the Unions violated § 8(b) (2) and (1) (A) thereof.

The order of the Board will be enforced.